## Archibald E. Swan, Appellee, v. Tabor Co-Operative Grain Company et al., Appellants.

### Gen. No. 8,111.

Opinion filed May 2, 1928.

LEONARD W. INGHAM and LOTT R. HERRICK, for appellants.

A. E. CAMPBELL, F. K. LEMON and L. O. WILLIAMS, for appellee.

MR. JUSTICE NIEHAUS delivered the opinion of the court.

Archibald E. Swan, the appellee, commenced this suit in trover in the circuit court of DeWitt county, against the appellants, Tabor Co-Operative Grain

Company, a corporation, and Elmer Maddox, C. H. Sprague, Henry Gehlbach, C. L. Brittin, S. M. Keys, Charles Klemm, Harry Schoth, Harry Sprague and H. D. K. Thomas, as directors of the company, to recover damages for a wrongful conversion by the company and other appellants named of 847 bushels of wheat and 2,035 bushels of oats which he alleges were delivered to the Tabor Co-Operative Grain Company, for storage, and wrongfully converted. There was a trial by jury which resulted in a verdict and judgment in favor of the appellee against all of the defendants in the suit in the sum of $425.49. This appeal is prosecuted from the judgment.

A number of questions are raised and argued for a reversal of the judgment. The main question presented for review is whether the delivery of the grain by appellee to the Tabor Co-Operative Grain Company, which it is alleged the appellants wrongfully appropriated and converted to their own use, involved a bailment or a sale to the Tabor Co-Operative Grain Company. It appears from the evidence that the Tabor Co-Operative Grain Company is a corporation which was organized in 1915, to conduct the business of "purchasing of or selling to all shareholders and others, grain, agriculture products, coal, fuel, groceries, provisions and any and all other articles of trade or merchandise," and this company, since its organization and at the time this controversy arose, was transacting the business for which it was organized, and in connection therewith operated an elevator at Tabor, Illinois. The business and elevator of the company was in charge of Calvin Gambrel as manager. Concerning his business transactions with the Tabor Company, which are the basis of this suit, the appellee testified as follows:

"I am a farmer and the plaintiff in this suit. I was farming my place in 1924. I raise corn, oats and

wheat. I delivered them to the Tabor Co-Operative Grain Company, I delivered 847 bushels of wheat and 736 bushels of oats. I delivered the wheat on August 6th and the oats on September 10th. I weighed the grain at home and got the weights from the elevator. They corresponded almost to the bushel. I was the owner of the grain. I raised corn and oats on my farm in 1925. I delivered them to the Tabor Co-Operative Grain Company on July 24th and 25th. There were 1,299 bushels of oats. At the time I delivered them there I had a conversation with Calvin Gambrel as to putting the grain in there. * * * He bought and sold grain and did such other duties as the manager of a farmers' elevator is supposed to do. * * * In 1924 I had a conversation with Calvin Gambrel just prior to the time I put the oats and wheat in. It was about the middle of July. I asked Mr. Gambrel if I could store some grain at the Tabor Co-Operative Grain Company's elevator—wheat and oats—and he said that I could, because he had sufficient room. He said the storage on the grain would be a half cent a bushel per month. I said that would be all right with me, and I would deliver my wheat to him and my oats when I threshed. I did so. I had stored oats in that elevator before.

"In 1925, before I delivered the oats to the elevator, I had a conversation with Mr. Gambrel about that matter about the middle of July at the office of the Tabor Co-Operative Grain Company.

"Q. And what did you say to Mr. Gambrel at that time, and what did he say to you?

"A. I asked him I could store some oats in the company's elevator. He said that I could.

"He said that the storage was the same as it had been, a half cent a bushel per month. I said that would be all right with me. I delivered the oats. Subsequent to the time I put the oats in there I had a con-

versation with Calvin Gambrel on January 19, 1926. * * * I asked him what the price of grain was. He said that he could pay $1.75 a bushel for wheat and 36 cents per bushel for oats in store. * * * He said: 'I could mark your grain sold on the books but I couldn't pay you for it today.' He said: 'The directors instructed me not to write any more checks for the present, but they promised to raise the money to pay for this grain in a short time.' He said: 'The elevator is now empty'; that he had shipped out all the grain and emptied the elevator at the instructions of the Board of Directors of the Company. * * * I told him that as long as they had promised the money to pay for this grain in a short time that I would just have them to mark my grain sold on the books.''

As to what occurred between the appellee and Calvin Gambrel, the manager of the Tabor Company's elevator with reference to a sale of the grain in question, the appellee's testimony is as follows:

''Q. Did you tell him on that occasion you would sell him the oats and wheat?

''A. Yes, but I would like to have the privilege of qualifying that answer.

''The Court: I think he has a right to qualify.

''A. I told him he could mark the grain 'sold' on the books, inasmuch as he had told me that the directors had promised him to pay for this grain in the near future. * * *

''Q. Did you tell him the price at which you would sell him the wheat?

''A. We agreed on the price.

''We agreed on $1.75 per pushel for wheat, with 6 cents deducted for storage. We agreed on the price of the oats at 36 cents per bushel. He said he wouldn't charge any storage on the oats.''

On cross-examination, and in answer to the inquiry, "Were you paid part on this grain in question that you claim to have stored with the defendant corporation," the appellee answered, "Not after I had it marked 'Sold' on the books."

"Q. Before that, were you?

"A. I drew money on the grain. I drew money from Calvin Gambrel as manager of the Tabor Co-Operative Grain Company. Defendants' Exhibit B represents a part of the money I drew on that grain. I remember how much money I drew altogether. It was all drawn by check. I believe I did get a load of coal I had forgotten about and was taken out of the account for the grain that I delivered there to the Tabor Co-Operative Grain Company's elevator.

"Q. You also had Mr. Gambrel issue to Bartlett-Frazier & Co. a check for $600.00 on account of this grain, did you not?

"A. Yes, sir.  *  *  *

"Q. The coal that you mentioned a while ago, you got that about the 17th of July, 1925, didn't you?

"A. I think so, somewhere about that date. I think the amount of the coal was about $7.50. I got a check from Mr. Gambrel or had one issued on my account for $300.00 on or about the 9th day of March, 1925, and that was on account of the oats and wheat in question.

"Q. On the 10th of March, 1925, you had Mr. Gambrel issue a check for your benefit to the account known as the trading account there for $292.46, did you not?

"A. I believe I did.

"Q. And that was on account of these same wheat and oats, was it not?

"A. I think so.  *  *  *

"Q. About the check of March 12, 1925, was not that a check issued to Fred Smith, at Lincoln, in the Bartlett-Frazier grain office, and issued for your account?

"A. I think there was one issued to Fred Smith, but I don't recall the amount or date.

"Q. Was it on or about that time?

"A. I think so.

"Q. Was it for about the amount of $200.00?

"A. I think so.

"Q. And that was on account of the same wheat and oats that were involved in this lawsuit, was it not?

"A. Yes, sir.

"Q. At the time you left that wheat there in 1924 you expected to get from the grain company whatever the wheat was worth on the day you were ready to sell it?

"A. Yes, sir.

"Q. When you left the wheat there at the elevator of the Tabor Co-Operative Grain Company in 1924 did you expect to sell that wheat to the Tabor Co-Operative Grain Company and have your money paid to you on the day you called and demanded it at the market price on that day?

"A. Paid to me as I directed it. * * *

"Q. On the occasion when you left the oats in the elevator of the Tabor Co-Operative Grain Company in 1924 did you expect to get from the Tabor Co-Operative Grain Company whatever the oats were worth on the day you elected to sell?

"A. Yes, sir; I expected to sell the oats and get the money for them.

"When I left the oats there in 1924 in the elevator of the Tabor Co-Operative Grain Company I expected to sell these oats to the Tabor Co-Operative Grain Company and have my money paid to me for them any

day that I called and demanded it, at the market price on that day, or as I directed it.

"When I left the oats there in 1925 in the elevator of the Tabor Co-Operative Grain Company I expected to get from the Tabor Co-Operative Grain Company whatever the oats were worth on the day I elected to sell them. I expected to sell the oats to the Tabor Co-Operative Grain Company and have the money paid to me for them any day that I called and demanded it, at the market price on that day.

"When I left the oats in the elevator of the Tabor Co-Operative Grain Company in 1925 I expected to sell the oats and get the money. I did not expect to get back the oats. * * *

"Q. What was your intention with reference to selling the grain at that time that it was in storage?

"A. I intended that the grain should remain there in storage, and intended to pay storage on it until such time as I should agree with the company upon the terms of sale. * * *"

Calvin Gambrel, who was a witness for the appellee, testified in reference to the sale of the grain on the 19th day of January, 1926:

"Mr. Swan said he wanted to sell his wheat and asked me what I would pay him for it. I told him $1.75 for wheat and 36 cents for oats. I told him that I couldn't pay him for it; all I could do was to mark it 'sold' on the books. He said that that would be all right. He said that he wanted a receipt for his grain and when he said he wanted a receipt for his grain I made out this paper marked Exhibit 14. * * * I charged 6 cents compensation for leaving the wheat there, and I marked the wheat sold for $1.75, I think I took 6 cents off for storage. * * * Mr. Swan was present at the time I made the computation here where

the top number is 847 and underneath that the number 169 and apparently a multiplication and a line drawn under it, and total 1431.43; 847 indicates the number of bushels of wheat. The number 169 indicates $1.69 a bushel for that wheat. The figures 1431.43 indicate the total price of the wheat on the 19th day of January, 1926. On that same occasion I wrote the entry 'Cr. Ledger, January 19th, 1926.' That writing was put there at the time Mr. Swan was there, and that writing means I gave credit to Mr. Swan on the books of the company on that day in the sum of $1431.43, representing the price at which the wheat was sold to this defendant corporation, after the storage had been deducted. * * * The figures 2035 indicate the number of bushels of oats that were delivered there in 1925 by Mr. Swan. The figures 36 indicate the price paid him. The figures 732.60 indicate the amount he got credit for on the books of the company. The words 'Cr. Ledger January 19, 26' indicate that he got credit on the ledger 1926, for 2035 bushels of oats at 36 cents per bushel. * * * 2035 representing the number of bushels of oats, represent the number of bushels of oats delivered by the plaintiff to the defendant company both in the years 1924 and 1925. The ledger referred to on the reverse side of that page is one of the ledgers kept by me as manager of the company.''

The ledger accounts were kept by the Tabor Co-Operative Grain Company in the regular course of business with its customers concerning the grain sold to the company, and the amounts paid on or drawn against the same. The account of the appellee which was kept by the company in that way was introduced in evidence and shows the grain received by the company from the appellee, and the different amounts of money drawn by him, and the amount of coal he re-

ceived on account of the grain delivered to the company. This account is as follows:

Archie Swan

Bal brot ford 585.50

| Date 1924 | Items | Folio | Debit | Credits | Balance |
|---|---|---|---|---|---|
| Aug. 4 | To coal | 41 | 4.02 | | 589.52 |
| Nov. 3 | To ck draw on Gr. | 5 | 250.00 | | 829.52 |
| Dec. 10 | To ck draw on Gr. | 7 | 229.02 | | 1058.54 |
| 1925 | | | | | |
| Jan. 5 | To ck draw on Gr. | 10 | 250.00 | | 1308.54 |
| Jan. 15 | Cr. by corn | 11 | | 1308.54 | 10.— |
| Feb. 11 | To ck draw on wheat | 14 | 600.00 | | |
| Mar. 9 | To ck draw on wheat | 20 | 250.00 | | 850.00 |
| Mar. 10 | To transfer our T a/c | 20 | 292.46 | | 1142.46 |
| Mar. 12 | To ck | 20 | 200.00 | | 1342.46 |
| Aug. 3 | To ck draw | 33 | 250.00 | | 1592.46 |
| July 17 | To coal | 39 | 7.50 | | 1659.96 |
| Dec. 30 | To ck | | 100.00 | | 1749.96 |
| Jan. 6 | Cr. 163 Corn | | | 114.10 | 1635.86 |
| Jan. 19 | Cr. by 847 wheat | | | 1431.43 | 204.43 |
| Jan. 19 | Cr. by 2035 oats | | | 732.60 | 518.17 Cr. |

The only inference which can be reasonably drawn from the evidence, including the appellee's own testimony, is that the appellee delivered the grain in question to the Tabor Co-Operative Grain Company to be stored in its elevator for the purpose of sale to the company, the price to be fixed at the market price of the grain on the day the appellee concluded to consummate the sale; that with this purpose in view and in advance of the consummation of the sale, he drew various amounts of money at different times from the company against the purchase price thereafter to be

fixed, and against the amount of money which would eventually become due him upon such sale; and also received a quantity of coal from the company on the same account; that the sale as contemplated by the parties was finally consummated and an accounting had between them on January 19, 1926, based upon the market price of the grain on that day, and the balance due the appellee was arrived at by crediting the appellee with the amount due for the grain sold at the market price and charging him with the different amounts of money and the coal received by appellee from the company, and charging him for storage. Appellee thereupon agreed to await payment of the balance which was found to be due him from the company at a future day which was not definitely fixed. In this state of the record it is evident that the storing of appellee's grain in the Tabor Company's elevator was for the purpose of sale to the Tabor Company, and that the transaction involved a sale and not a bailment. *Lonergan v. Stewart,* 55 Ill. 44; *McEwen v. Morey,* 60 Ill. 32; *Ives v. Hartley,* 51 Ill. 520; *Richardson v. Olmstead,* 74 Ill. 213. We conclude from the evidence and in view of the authorities cited that the appellee's right of action does not lie in trover for wrongful appropriation of the grain in question by the appellants; but that his right of action is against the Tabor Co-Operative Grain Company for the balance due on the purchase of the grain in question, which balance was ascertained and agreed upon between him and the company at the accounting had on January 19, 1926. The judgment is therefore reversed and the cause remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*